**Robert W. AYERS, Appellant,**

v.

**Stuart LANDOW, Appellee.**

**No. 93–CV–1505.**

District of Columbia Court of Appeals.

Argued June 12, 1995.
Decided Oct. 2, 1995.

Ricardo V. Johnson, Washington, DC, with whom Kenneth J. Loewinger was on the brief, for appellant.

Morris R. Battino, Washington, DC, for appellee.

Before SCHWELB and RUIZ, Associate Judges, and MACK, Senior Judge.

SCHWELB, Associate Judge:

During the course of a bench trial in this dispute between a landlord and a tenant, the judge entered judgment in the tenant's favor upon the ground that the landlord failed to serve a Notice to Cure Violations of Tenants or Vacate (the notice) in the manner required by law. Although we recognize, as did the trial judge, that the requirement with which the landlord failed to comply is a hypertechnical one, we agree with the judge that the applicable statute, reasonably construed, compels the result that he reached. Accordingly, we affirm the judgment.

## I.

At the time of trial, appellee Stuart Landow had been, for approximately fourteen years, a tenant of one unit in a small apartment building in northwest Washington, D.C. Landow and his landlord, appellant Robert W. Ayers, had been embroiled for several years in a dispute regarding the proper rent level. As a result of this dispute, Landow had been paying the equivalent of his rent into the registry of the Superior Court pursuant to a protective order. In October 1993, the amount in the registry was approximately $24,000.

Ayers testified that in January 1993, he discovered that a huge leak in Landow's apartment was causing water to "cascade" down into the unit below. When he went to investigate, Landow was not at home. Ayers and his employees entered the apartment with a pass key. They found water running at "virtually full force" from the sink, evidently because the trap was broken. There was a pot placed under the trap, which led Ayers to believe that Landow knew of the leak but had failed to report it to the landlord.

At trial, Ayers described the apartment as being in shocking condition.[1] Photographs were introduced into evidence and, after having seen them, the judge remarked that "there's no one in the United States who wouldn't try to get a tenant out if the place looked the way this place does."

Following an unsuccessful informal attempt to persuade Landow to correct the conditions in the apartment, Ayers determined to seek possession of the premises upon the grounds that Landow was in violation of a provision of his lease requiring him to maintain the unit in good order. *See* D.C.Code § 45–2551(a) (1990). On March 12, 1993, Ayers' attorneys sent to Landow, by certified mail, a "Notice to Cure Violation of Tenancy or Vacate." Subsequently, on

---

1. The testimony included the following:

THE WITNESS: I can honestly say that I've never seen an apartment in as bad condition, and I can be specific. There was approximately a quarter inch of dust over the entire apartment on the floor, probably 500 newspapers in various states of having been crumbled up or stacked, used Kleenex thrown throughout the apartment, pails of human hair in the bathroom.

THE COURT: Pails of human hair?

THE WITNESS: A pail.

MR. BATTINO (counsel for the tenant): There's a difference, Your Honor.

THE COURT: Okay.

THE WITNESS: A pail.

THE COURT: Pail of human hair. Okay.

THE WITNESS: Approximately 20 Chips Ahoy or cookie containers crumbled, approximately 20 empty cereal boxes, approximately two dozen milk cartons. Now, these are just in the apartment.

In the refrigerator, which had apparently never been defrosted, I found eight to ten ice cream cartons, a piece of meat with maggots, further, perhaps a dozen milk cartons.

The bed appeared as though it had been defecated in, or the tenant had attempted to cleanse himself with the covers. The smell coming from that unit is just overpowering. I personally can—it's hard to take a breath in there.

March 17, March 19, April 7, and April 9, 1993, a process server attempted to effect personal service of the notice on Landow. Landow was apparently not at home on any of these dates [2] and, on all four occasions, the process server posted a copy of the notice on the door. On May 10, 1993, the conditions in the apartment having been only minimally abated, Ayers filed suit for possession in the Superior Court.

## II.

■ Following several preliminary skirmishes not relevant to this appeal, the case came to trial on October 20, 1993. On the judge's initiative, court and counsel focused on D.C.Code § 45–1406 (1990), which provides in pertinent part that

[i]f the notice [to quit] [3] is posted on the premises, a copy of the notice shall be mailed first class U.S. mail, postage prepaid, to the premises sought to be recovered ... *within 3 calendar days of the date of posting.*

(Emphasis added). Landow contended that § 45–1406 is unambiguous, and that mailing of the notice a substantial period before the posting was not in conformity with the plain language of the statute. Ayers, placing his primary reliance on *District of Columbia v. Gantt,* 558 A.2d 1120, 1122 (D.C.1989), argued that the phrase "within three days" was ambiguous, and could reasonably be interpreted to mean no later than three days after the posting.

After repeatedly expressing concern about the technical character of Landow's defense [4] and its lack of any relationship to the merits of the controversy, the judge ruled, "with great pause and hesitation," in Landow's favor. The judge found it "strange that the legislature would say within three days and mean two weeks before." He ruled, in pertinent part, as follows:

The operative sentence says "If the notice is posted on the premises, a copy shall be mailed within three days." Evidently, self-evidently, in my judgment, that statute envisions something that happens if there has been posting. If the precedent event of utilizing posting service has occurred, then the party shall mail. It does not contemplate some kind of blanket prophylactic earlier mailing, and in this instance, as I recall, the evidence revealed that there was a mailing some ... [s]even days prior to posting in the case. It seems to me that the plain meaning of that statute is that if you have been unable to effect the two preferred kinds of service for a notice to cure, then, if you post, you shall mail; and one has to come before the other, it seems to me.

---

**2.** All four of the days on which personal service was attempted were working days, and each attempt was made during working hours. Landow claims that he has daytime employment and that Ayers should have known that Landow would be working at the times the process server came to his apartment and would not be at home. In light of our disposition, we have no occasion to determine whether these attempts constituted due diligence. *See* D.C.Code § 45–1406 (1990), authorizing service by posting only if tenant "can not be found."

In addition to attempting to serve Landow at home at times when Landow would be expected to be at work, Ayers (or his attorneys) complicated the process by use of a notice to quit which contained singularly infelicitous phraseology. The notice, which was undated, contained this illuminating explication of the time available to Landow to cure or quit:

Please be advised that if you fail to cure said violation(s) prior to the end of the thirty day period you are to vacate the premises at the expiration of this notice. This notice will expire as of the expiration of your monthly ten-

ancy which ends right after the expiration of thirty days after the date this notice is served on you. *This is the only notice you will receive.* (Emphasis added).

In spite of the italicized language, Landow was served with this notice on five different occasions, once by mail and four times by posting. He did not, however, make any claim in either court that the confusing content of the notice rendered it legally defective, and we do not base our decision on that ground.

**3.** A notice to cure and a notice to quit may be combined, as they were in this case, into a single document. *Cormier v. McRae,* 609 A.2d 676, 680 (D.C.1992).

**4.** The judge remarked, *inter alia,* that "this is landlord-tenant court ... [t]he land of hypertechnicality." *Cf. Winchester Van Buren Tenants Ass'n v. District of Columbia Rental Hous. Comm'n,* 550 A.2d 51, 52 (D.C.1988) (judges presiding over landlord-tenant controversies must accustom themselves to "the esoteric and the arcane").

To adopt the plaintiff's interpretation of this statute could lead to a kind of temporal anarchy, it seems to me, with regard to the scheme. . . .

The judge next addressed the practical implications of Ayers' position. He observed that, under the landlord's proposed construction of § 45–1406, "hypothetically, what you could do is to mail on January 1st and then, when you get around to it in June, you could post, and then wait 30 days and bring a lawsuit at the end of June." Alternatively, the judge observed, "you could just do a prophylactic mailing of a bunch of notices to cure saying you've all got too many people, then wait 60 days, 90 days, see if you're happy—and post on the people that are still a problem." The judge concluded that "that kind of ambiguity with regard to this advance mailing, without the predicate [event] having yet occurred of posting, is just clearly not what's contemplated by the statute." Finally, he pointed out that "there's certainly no prejudice or burden on a landlord from complying with a straightforward interpretation of this statute."

Ayers relied heavily on *Gantt, supra,* 558 A.2d at 1122–23. In *Gantt,* this court was called upon to construe D.C.Code § 20–903(a) (1981), which provided at that time that claims against a decedent's estate were barred "unless presented within 6 months after the date of the first publication of notice of the appointment of a personal representative." We held in *Gantt* that the quoted language "does not clearly state whether a claim may only be filed within the specified six-month period or may be filed earlier but no later than the end of that period." *Id.* at 1122. After considering the legislative history of § 20–903(a), we concluded that the legislature "focused only on a termination date for the filing of claims, not on a beginning date as well." *Id.* at 1123.

The trial judge remarked that the decision in *Gantt* "has to give me pause," and that it had almost caused him to rule in the landlord's favor. Upon further reflection, however, he concluded that "the *Gantt* case is clearly distinguishable." He described *Gantt* as standing for the proposition that "within," like other legal terms, does not have a single universal meaning. In *Gantt,* according to the judge, the use of the word "within"

> was clearly designed to drop a curtain of finality at the end, temporally, and [to] say that beyond this point you shall make no claims against a decedent's estate. [I]n *that* context, [the court] ruled that "within. can mean before." In my judgment, that does not mean that in *this* context "within" can mean "before."

(Emphasis added). The judge thus distinguished *Gantt* essentially upon the ground that the considerations discussed above at pp. 53–54, which in his view rendered Ayers' construction of § 45–1406 unreasonable and unworkable, were simply not present in *Gantt.*

### III.

The question whether § 45–1406 permits a mailing a substantial period before service by posting is purely one of law. We therefore need not accord the judge's ruling any deference, and our review is *de novo. Guadalupe v. United States,* 585 A.2d 1348, 1352 n. 7 (D.C.1991). We have, however, set forth the trial judge's reasoning in some detail because, in our view, his construction of the statute, which he gave orally from the bench, was both eloquent and persuasive. We agree with the judge that to read the phrase "within three days," in the present context, as countenancing mailings effected weeks or even months before the posting on which the landlord relies would create "temporal anarchy" and a host of practical problems which the legislature could not have intended. When, for example, would the tenant be required to "cure or quit" if a letter were mailed to him on January 1, and if a notice were tacked to his door half a year later on four different days in July? Moreover, the letter, by itself, is concededly ineffective to achieve service. It is, in effect, a nullity. We do not believe that such a nullity can be retroactively converted, a substantial period after the fact, into one part of a legally sufficient service of the notice.

In the present case, each posting of the notice followed an unsuccessful attempt to effect personal service. If Landow had been at home on any of the occasions when the

process server came to his apartment, posting would have been unnecessary, and the previously mailed letters would have accomplished nothing but confusion. The Council of the District of Columbia cannot be supposed to have intended that landlords be permitted to comply with the statute by mailing letters in advance of posting, when those letters might well turn out to be superfluous, and misleading to the tenant as well. The statute requires the mailing of the letter, as the judge pointed out, only *if* the notice is posted on the premises. When the notice has not been posted, there is nothing in the language or the purpose of the statute which would give effect to any mailing at all.

Moreover, the mailing of the notice to supplement posting is required by § 45–1406 for constitutional reasons. Notice by posting of a summons on the door to the tenant's apartment, without more, has been held to be constitutionally inadequate. *Greene v. Lindsey,* 456 U.S. 444, 453–56, 102 S.Ct. 1874, 1879–81, 72 L.Ed.2d 249 (1982). The mailing requirement was added in 1984; its timing suggests that it was enacted in response to the *Greene* decision. *Frank Emmet Real Estate, Inc. v. Monroe,* 562 A.2d 134, 136 n. 5 (D.C.1989).[5] The words of § 45–1406, literally construed, are wholly consistent with the apparent constitutional imperative; *if* you post, *then* you must mail, or the posting will not comport with due process. The mailing, in other words, is ancillary to the posting. Accordingly, we are satisfied that the judge's reading of the statute was correct.[6]

## IV.

Ayers claimed in the trial court, and reiterates on appeal, that the interpretation of § 45–1406 adopted by the trial judge is undu-

ly technical, and that the result is "contrary to the most fundamental principles of fairness and equity."[7] Ayers takes the position that Landow was not harmed by the "early" mailing and asks us, in effect, to invoke the principle of "no harm, no foul."

At least when framed in the abstract, Ayers' argument is not without appeal. There appears to be no question that Landow received the notice to quit or cure. It was posted on his door on four separate occasions and mailed to him once. Two months later, in May 1993, the complaint in Ayers' action for possession was served on Landow. The trial did not begin until October. Landow does not deny, nor can he, that he was fully apprised of the claim which Ayers was making against him long before Landow was called upon to defend it.

Moreover, although the case was decided in Landow's favor before he had any occasion to present a substantive defense, it appears from the judge's comments on the photographs which were admitted into evidence that Ayers presented a strong prima facie case which might not be easy for Landow to meet on the merits. An observer not conditioned by the niceties of our landlord-tenant law might well ask why, if the tenant is apparently in breach of a basic condition of his lease, and if he has received actual notice of the landlord's contentions on numerous occasions, the case against him should be thrown out of court without any determination of the merits.

As counsel for the tenant explicitly conceded at argument, the requirement of a notice to quit was initially designed to prevent "surprise" evictions, and to assure that a tenant would have notice before finding his

---

5. The *Frank Emmet* decision deals with the 1984 amendment of D.C.Code § 16–1502 (1989), which provided that a *summons* served by posting must also be mailed to the tenant. That amendment, which is contained in the Eviction Procedures Act of 1984, D.C.Law 5–90, 31 DCR 2537, also imposed such a requirement for the service of a notice to quit in D.C.Code § 45–1406.

6. Our dissenting colleague suggests that § 45–1406 is ambiguous because, according to the trial judge, other members of his court "are ruling in different directions on this issue." But

"[t]o conclude that the debatability of the question whether the statute is ambiguous in itself renders the statute ambiguous is to hand the appellant a victory without requiring him to win any points." *United States v. Anderson,* 313 U.S.App.D.C. 335, ——, 59 F.3d 1323, 1340 (1995) (en banc) (dissenting opinion of five judges per Ginsburg, J.).

7. The trial judge synopsized the landlord's main argument: "[S]o [long as] the tenant gets notice in advance, what's the harm."

furniture on the street. *See Davis v. Hunter,* 104 Daily Wash.L.Rptr. 929, 934 (Super.Ct.D.C.1976); *Hughes v. Johnson,* 108 Daily Wash.L.Rptr. 1745, 1749 n. 7 (Super.Ct.D.C.1980). At common law, the landlord was entitled to use self-help to recover possession, *see Snitman v. Goodman,* 118 A.2d 394, 397–98 (D.C.1955), *overruled by Mendes v. Johnson,* 389 A.2d 781 (D.C.1978) (en banc), and the possibility that a tenant's belongings would be removed from the premises by the landlord was a realistic one. Since our decision in *Mendes,* however, a tenant cannot lawfully be dispossessed without the institution of suit, which will provide him with notice; if the landlord uses self-help, the tenant has a right to compensatory damages, and may be entitled to punitive damages and an award of counsel fees as well. *See, e.g., Parker v. Stein,* 557 A.2d 1319, 1321–22 (D.C.1989).

In the present instance, as in most cases, the salutary purpose of avoiding eviction without notice could be achieved simply by serving the tenant with the landlord's complaint for possession. *Davis, supra,* 104 Daily Wash.L.Rptr. at 934. Landow had ample time following the service of that pleading to prepare his defense. Under these circumstances, any imperfection in the timing,[8] con-

tent,[9] or manner of service [10] of the notice did not cause or threaten any of the mischief which a notice to quit was initially designed to avert. *Cf.* OLIVER WENDELL HOLMES, THE PATH OF THE LAW 187 (1921) ("[i]t is revolting to have no better reason for a rule of law than that it was laid down in the time of Henry IV"). We think it fair to conclude, in any event, that Ayers' failure to comply with the commands of § 45–1406 did not prejudice Landow at all. It is not surprising that the first substantive words spoken by Landow's attorney at the trial were: "Your Honor, landlord and tenant law is a law of technicalities."

Although there are those who rejoice in this regime,[11] there is a price to be paid. The present case illustrates the reality that it can be difficult even for attorneys from a law firm which specializes in this type of litigation to dot all their i's and cross all their t's with regard to the preparation and service of a legally sufficient notice to quit. As the trial judge noted, it should not be difficult for trained attorneys to comply with § 45–1406 as we now construe it. Many of the plaintiffs who bring actions for possession in the Superior Court, however, are small landlords who do not have legal training. They are supposed to be in a forum in which "lay persons,

---

8. The confusion that can arise as to when a notice to quit is to be served is evident from the present case. For other illustrations of such confusion, *see, e.g.,* the majority and dissenting opinions in *Zoby v. Kosmadakes,* 61 A.2d 618, 620–21 (D.C.1948); *cf. Pritch v. Henry,* 543 A.2d 808, 811–12 (D.C.1988).

9. It has been held, for example, that a notice to quit is defective for purposes of a residential lease if it is not written in Spanish, even if the tenant speaks only English (or, for that matter, Slovak, Swedish or Swahili). *See Kline v. Kelly,* 116 Daily Wash.L.Rptr. 101, 104–05 (Super.Ct.D.C.1988), but *cf. Ontell v. Capitol Hill E.W. Limited Partnership,* 527 A.2d 1292, 1295 & n. 4 (D.C.1987).

10. *See, e.g., Jones v. Brawner,* 435 A.2d 54, 56–57 (D.C.1981), holding that a tenant who failed to pay rent for a year and who has signed a receipt reflecting that he received the notice by registered mail, may successfully move to dismiss the action because the complaint was not served on him in the manner prescribed by law.

11. A judge of the Superior Court of Connecticut has written:

When a tenant, who is under an oral month-to-month lease, is served an eviction notice during the first ten days of the month for failure to pay rent, the situation is also a setup for the [tenant's] lawyer. This is a common mistake of a downtown attorney inexperienced in landlord-tenant law. With lip-smacking relish, the [tenant's] attorney moves to dismiss. "The statute is very clear," he explains. "It provides for a ten-day grace period to pay rent under an oral lease. In this case the notice to quit was served on the ninth day of the month. Consequently, it is too early for the current month. It is also too late for the preceding month, because such notice must be served during the month in which the rent was not paid."

He is dead right. I throw the case out and again send Mr. Three-Piece Suit packing. I must confess a secret delight in seeing the rich, who so often use legal technicalities to their advantage, being outclassed in their own game by the skillful representatives of the poor.

JUDGE ROBERT SATTER, DOING JUSTICE—A TRIAL JUDGE AT WORK 220, 221–22 (1990).

operating without legal assistance, [can] initiate and litigate ... judicial proceedings." *Goodman v. District of Columbia Rental Hous. Comm'n,* 573 A.2d 1293, 1299 (D.C. 1990). "Procedural technicalities are particularly inappropriate in such a statutory scheme." *Id.* The unfortunate *pro se* landlord caught in the bewildering maze of notice to quit requirements, *see* notes 8 through 10, *supra,* may find himself in much the same position as the Mikado's disfavored "billiard sharp," who had to play

.... extravagant matches
In fitless finger-stalls
On a cloth untrue
With a twisted cue
And elliptical billiard balls.

WILLIAM GILBERT & ARTHUR SULLIVAN, THE MIKADO, Act II (1885).

---

In light of the foregoing, Ayers may well have a legitimate claim, in the abstract, that a decision in Landow's favor is unjust or even irrational. Assuming that he does, however, the relief he seeks must be obtained in another forum.

 The requirement that the landlord serve the notice to quit or cure in a specified way is imposed by statute. Section 45–1406 was enacted in 1901, *see* Stat. 1382, ch. 854, § 1223, and it was reaffirmed and even broadened as recently as 1990. *See* D.C.Law 5–90, § 3, 31 DCR 2537. The Council of the District of Columbia has thus retained the requirement of a properly served notice to quit long after the dissipation of any danger that the tenant would be physically evicted without notice of the landlord's intention to recover possession of the premises. Moreover, we have held that the proper service of a notice to quit is a condition precedent to the institution of suit. *Moody v. Winchester Mgmt. Corp.,* 321 A.2d 562, 563 (D.C.1974); *see also Jones v. Brawner, supra* note 10, 435 A.2d at 56–57 & n. 9. "Posting" should be employed only as a last resort, and "[w]hen a landlord has to fall back on this method of service, he must strictly comply with the statutory requirements." *Moody, supra,* 321 A.2d at 564.

 "It is not within the judicial function ... to rewrite the statute ... in order to make it more 'fair'".... *1841 Columbia Road Tenants' Ass'n v. District of Columbia Rental Hous. Comm'n,* 575 A.2d 306, 308 (D.C.1990). "Our duty, to paraphrase Mr. Justice Holmes in a conversation with Judge Learned Hand, is not to do justice but to apply the law and hope that justice is done." *Bifulco v. United States,* 447 U.S. 381, 402, 100 S.Ct. 2247, 2259, 65 L.Ed.2d 205 (1980) (Burger, C.J., concurring). Because we agree with the trial judge's construction of § 45–1406, the judgment appealed from is hereby

*Affirmed.*

RUIZ, Associate Judge, dissenting:

Robert W. Ayers, a landlord, brought an action for possession of real estate in the Landlord and Tenant Branch of the Superior Court as a result of the failure of the tenant, Stuart Landow, to cure numerous violations of tenancy in the landlord's apartment building. The trial judge entered judgment in the tenant's favor, ruling that he did not receive a properly-served notice to cure the violations or quit the premises as required by statutory service provisions. Because I conclude that the tenant did receive notice consistent with statutory requirements, I would reverse the judgment and remand this case for further proceedings.

I.

The parties have had a difficult landlord-tenant relationship for over fourteen years. In January of 1993, the landlord entered the tenant's apartment and found an uninhabitable and toxic scene. The tenant appeared to be in violation of provisions of his lease requiring him to maintain the apartment in good order. The question before us is whether the landlord gave proper notice to begin the legal process to take possession of the premises for the tenant's failure to abide by the terms of the lease. D.C.Code §§ 45–1406, –2551(a) & (b) (1990). Specifically, the question is whether the landlord's mailing the tenant a copy of a Notice to Cure Violation of Tenancy or Vacate on March 12, 1993, followed by a posting of the Notice on the

tenant's door on March 19, March 24, April 7, and April 9, 1993, complied with the statutory requirement that

> [I]f the notice is posted on the premises, a copy of the notice shall be mailed first class U.S. mail, postage prepaid, to the premises sought to be recovered, in the name of the person known to be in possession of the premises, or if unknown, in the name of the person occupying the premises, within 3 calendar days of the date of posting.

D.C.Code § 45–1406 (1990).

At trial, the tenant argued that since the landlord mailed the copy prior to posting the notice, and not within the three days following the posting, the service was technically insufficient. The landlord defended his service, arguing that § 45–1406 is ambiguous with regard to when the notice must be mailed. The landlord's contention was and is that "within three days" is not a fixed period of three days following posting, but can be read as a point of conclusion—a date by which the mailing must occur, but not precluding the mailing prior to the date of posting. In support of his contention, the landlord relied chiefly on *District of Columbia v. Gantt,* 558 A.2d 1120, 1122 (D.C.1989), in which this court held that a probate statute barring claims against an estate unless the claim was filed "within 6 months after the date of the first publication of notice of the appointment of a personal representative," D.C.Code § 20–903(a) (1989),[1] did not prevent a person from lodging a claim prior to the appointment of the representative. Instead, the court interpreted "within six months after" to fix a date of six months following publication of notice of that appointment as the date beyond which no claim could be made.

The trial court considered *Gantt,* but reasoned that the statutory provision, "[i]f the notice is posted on the premises, a copy of the notice shall be mailed . . . within 3 calendar days of the date of posting," meant that the posting *must* be antecedent to the mailing, an interpretation mandated by the statute's use of the word "if". *See also* majority

opinion at 55 (suggesting that the term "then" be read into § 45–1406 in order to create an "if-then" chronology requiring the mailing to be ancillary to posting). The trial court recognized that the *Gantt* rule fixing termination dates appeared to be compelling precedent, especially in light of the probate statute's use of the words "within 6 months *after.*" (Emphasis added.) Nevertheless, the trial court distinguished *Gantt* from the present case on its facts, and what the court thought were the possible consequences of applying the *Gantt* rule to the landlord-tenant relationship. The trial judge concluded that "[t]o adopt the plaintiff's interpretation of this statute could lead to a kind of temporal anarchy" in the landlord-tenant context, depriving tenants of adequate certainty regarding when their exposure to an eviction action would begin. Although the judge conceded that on the merits of the action the landlord had a "powerful case," he nevertheless entered a judgment for the tenant, ruling that the language of the service statute forbade the landlord's premature mailing.

## II.

At the outset, we look at the language of the statute; specifically, whether the meaning of "within 3 calendar days" as used in § 45–1406 is plain or ambiguous. The trial court ruled that there was no ambiguity in the wording of the statute, and that the mailing of a copy of the notice must occur within three days *after* posting of the notice on the premises. However, as evidenced by the court's interpretation in *Gantt, supra,* and the cases from other jurisdictions cited by the landlord, it is equally plausible that the statute be read to mean that a mailing must occur at any time, but *not later than* three days after posting. *See, e.g., Jensen v. Nelson,* 19 N.W.2d 596, 598–99 (Iowa 1945) (ruling that where testator had willed a portion of his estate to the county to build a courthouse if the building was completed within ten years after the testator's death, the estate must furnish the money where the building was completed between the writing of the will and death of the testator); *Tanzilli v. Casassa,* 324 Mass. 113, 85 N.E.2d 220,

---

1. At the time of the decision in *Gantt,* this statute appeared in a 1981 volume.

221 (1949) (permitting appeal of a zoning board decision prior to the rendering of that decision, where statute said the appeal must be made within fifteen days after the decision of the board); *Reifke v. State*, 31 A.D.2d 67, 296 N.Y.S.2d 667, 669–70 (1968) (holding that a property owner can make a claim against the state prior to the completion of the state action where statute says claim must be made within six months after completion of the action by the state); *Adams v. Ingalls Packing Co.*, 30 Wash.2d 282, 191 P.2d 699, 701 (1948) (holding that a statement of conditional sale of goods can be filed with the state auditor before the delivery of goods where statute says the statement must be filed within ten days of delivery of goods).

In resolving the question whether the statute is ambiguous, we should be substantially guided by the determination of this court in *Gantt* that the probate statute's provision that claims could only be presented "within 6 months after the date of first publication of notice of the appointment of a personal representative" was ambiguous as to whether such presentation could occur before that publication was made. *See Gantt, supra*, 558 A.2d at 1122 ("This language does not clearly state whether a claim may only be filed within the specified six-month period or may be filed earlier but no later than the end of that period."). It is indisputable that if the legislature that enacted the statute in this case had intended only one of those possible meanings, it could have worded the statute more clearly directing that result. But the statute, as it appears, allows either reading. The trial judge recognized the ambiguity of the statute when he explained that "judges feel differently about this ... it's unfortunate that judges are ruling in different directions on [the issue of what 'within three calendar days' requires]." An unambiguous statute is rarely given to differing interpretations by different judges.[2] Just as the statute in *Gantt* was deemed by this court to be ambiguous, I conclude that the notice statute in this case also is ambiguous.

In *Gantt*, because the language of the statute did not clearly state whether "within" was intended to mean a fixed period in time or a deadline by which an action must be completed, the court concluded that it "must look at the legislative history of the statute" to interpret the term properly. *Gantt, supra*, 558 A.2d at 1122 (*citing Sanker v. United States*, 374 A.2d 304, 307 (D.C.1977)). Thus, we should similarly investigate the statute's legislative history in order to determine the correct interpretation of "within" in the context of § 45–1406.

The history of § 45–1406 reaches beyond its 1984 enactment, to the 1982 Supreme Court case of *Greene v. Lindsey*, 456 U.S. 444, 102 S.Ct. 1874, 72 L.Ed.2d 249. The question for the Court in *Greene* was whether the posting of a legal notice on a tenant's door satisfied the tenant's due process right to adequate notice of an alleged violation of the tenancy. The tenants in *Greene* asserted a lack of actual notice, arguing that in many cases where service was attempted by posting, notices were removed from doors before the tenants could retrieve them. The tenants had no way of knowing of the pending legal action. The Court reasoned that "[t]he sufficiency of notice must be tested with reference to its ability to inform people of the pendency of proceedings that affect their interests." *Id.* at 451, 102 S.Ct. at 1879. The purpose of posting was not simply to comply with a statutory requirement as a condition precedent to a legal action, it was to help meaningfully inform the parties facing the action what was required of them. *Id.* at 452–53, 102 S.Ct. at 1879. The Court concluded that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is *notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action* and afford them an opportunity to present their objections." *Greene, supra*, 456 U.S. at 449–50, 102 S.Ct. at 1877–78 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (emphasis added in *Greene* )). Posting alone was thus

---

**2.** This is unlike the argument criticized by the dissent in *United States v. Anderson*, 313 U.S.App.D.C. 335, 59 F.3d 1323 (1995) (en banc), that a debate about ambiguity is itself evidence of ambiguity. Cf. *ante* at 54.

determined to be insufficient to meet that purpose. *Id.* 456 U.S. at 455–56, 102 S.Ct. at 1880–81.

The Court then suggested an additional method of service that could be used to ensure that the requirement of notice was satisfied when posting was employed. "Particularly where the subject matter of the action also happens to be the mailing address of the defendant, and where personal service is ineffectual, notice by mail may reasonably be relied upon to provide interested persons with actual notice of judicial proceedings." *Id.* at 455, 102 S.Ct. at 1880.

The Eviction Procedures Act of 1983, Bill 5–134—enacting the amended version of § 45–1406, at issue in this case [3]—was introduced in March of 1983, less than a year after *Greene* was decided. We can deduce from the timing of the legislation that the mailing requirement for notice was introduced as a result of the *Greene* decision. *See Frank Emmet Real Estate, Inc. v. Monroe,* 562 A.2d 134, 136 n. 5 (D.C.1989). Viewed in the context of *Greene,* the "if" used in § 45–1406 is properly construed as conditional, not temporal. *Greene* makes clear that posting, by itself, is insufficient. The statute was thus amended to make clear that, to be effective, service by posting must also be accompanied by mailing. Although neither alone is legally sufficient, both, together, can constitute effective service.[4]

Although *Greene* provides some information regarding the purpose of the mailing requirement generally, it does not clarify why the Council of the District of Columbia felt that the mailing should occur "within 3 calendar days of the date of posting." D.C.Code § 45–1406 (1990). The Committee on Consumer and Regulatory Affairs, Council of the District of Columbia, Report on Bill

5–134, Eviction Procedures Act of 1984 (March 6, 1984) (hereafter Committee Report) does not discuss the time restrictions on mailing of the notice to cure or quit at all.[5]

There is evidence in the Committee Report that citizens were concerned that if landlords were allowed too much time to mail a copy of a summons *after* the posting of that summons, a tenant who did not receive the posting would not have enough time to prepare for a hearing after receiving a delayed mailing.[6] Thus, we know that the Council was made aware of tenants' concern about having adequate time to respond to a landlord's summons. A similar concern would apply where a landlord's notice required the tenant to cure violations in a thirty-day period before being served with a summons.[7]

Certainly, nothing in the legislative history indicates that the Council had or considered any other reason that would have led it to adopt a narrow three-day time period after posting during which mailing must occur. On the other hand, enacting the three-day limit to address the concern that tenants have enough time following service in which to cure violations before being sued would help the statute comport with the constitutional requirements established by *Greene,* as well as with our case-law precedent. *Gantt, supra,* 558 A.2d at 1123.

It is true, as the trial court and majority opinions explain, that landlord-tenant disputes should be adjudicated with attention given to technical compliance with the various procedural statutes that control the eviction process. *See Moody v. Winchester Management Corp.,* 321 A.2d 562, 564 (D.C. 1974). There is no reason why we should, however, sacrifice a common-sense and constitutional interpretation of the notice statute

---

3. This Bill also enacted D.C.Code §§ 16–1501 and –1502, governing the procedure for service of summons which parallels the procedure for service of notice to cure.

4. Nevertheless, the moment of posting, and not the mailing, begins the thirty-day period which must run before a court action can be instituted. Section 45–1406 refers to the "notice" being *posted* but only a *"copy* of the notice" being mailed (emphasis added).

5. The overwhelming majority of the report contains information and testimony regarding the

proposed requirement that notices and summons be written in both English and Spanish. This requirement was eventually adopted into § 45–1406 along with the mailing requirement at issue here.

6. A tenant may be required to appear in court seven days after the posting of a summons. D.C.Code § 16–1502.

7. D.C.Code § 45–2551(b) (1991).

to exalt hyper-technicality where it is not compelled by the statutory language and where no claim is made of a failure of actual notice. Indeed, this court has had occasion to rule that actual notice may, in some instances, prevail over technical compliance if the two are in conflict. *See, e.g., Frank Emmet Real Estate, Inc., supra*, 562 A.2d at 136–37; *see also Ontell v. Capitol Hill E.W. Ltd.*, 527 A.2d 1292, 1295–96 (D.C.1987) (upholding notice as adequate despite failure technically to comply with § 45–1406).

In the *Frank Emmet Real Estate* case, a tenant informed his landlord that he was temporarily relocating to Colorado, gave him the address there, and indicated the tenant's intent to return to live in his rented property in Washington. While the tenant was in Colorado, the landlord attempted eviction by posting a summons on the door of the Washington property and mailing a copy of the notice to the Washington address. In this way, the landlord comported with the express statutory requirements for service of summons. The court reasoned, however, that the landlord's strict adherence to the statute was of a "wooden manner" that the legislature did not intend. *Id.*, 562 A.2d at 136. According to the court, the purpose of § 16–1502, the service of summons statute that was amended at the same time as § 45–1406, the service of notice to quit statute, was to help ensure that a tenant was actually provided with the summons. Thus, where a technical application of the statute would not accomplish this goal, technical compliance would not comport with the spirit in which § 16–1502 was enacted. The court concluded that mailing to Colorado, where the landlord knew the tenant to be—and not the rented premises, as the statute requires—would have been statutorily sufficient. The court stated that "[w]e simply make what we think is a commonsense application of that principle [of mailing as an additional assurance of notice when posting occurs] to the facts here." *Id.* at 137.

At the very least, actual notice is one indication that the notice given was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." *Greene, supra*, 456 U.S. at 449–50, 102 S.Ct. at 1877–78 (emphasis omitted). I recognize that actual notice may not overcome service that clearly fails to comply with any interpretation of the notice statute. *See Moody, supra*, 321 A.2d 562, 563 (holding that notice was insufficient because it was slid under the tenant's door instead of being posted, regardless of the fact that the tenant actually received the notice). However, where no prejudice is alleged by the tenant from the method of service—the case here— and the method of service can be accommodated by the language of the statute, consistent with case law and the statute's legislative history, the court should not invalidate an otherwise adequate notice to quit. *Ontell, supra*, 527 A.2d at 1295 (holding that notice to an English-speaking commercial tenant was sufficient even though it was written only in English and not also in Spanish as § 45–1406 requires); *compare Jones v. Brawner Co.*, 435 A.2d 54, 56 (D.C.1981) (holding that because "[t]he requirement of strict compliance with the statute obviates some of the practical difficulties of proving delivery," notice to quit served by slipping under door was insufficient despite actual receipt of notice). This court suggested in *Gantt* that the question whether a particular form of notice was legally proper can be answered with reference to whether the server's interpretation of the notice statute at issue undermined an ascertainable statutory scheme. *Gantt, supra*, 558 A.2d at 1123–25. In the instant case, the landlord's service by mailing seven days before the first posting cannot be said to undermine any scheme intended by the legislature. *Ontell, supra*, 527 A.2d at 1295. Thus, I would interpret § 45–1406 as allowing mailing up to, but not later than, three days after posting.

Applying this interpretation of the statute and the *Greene* doctrine to the facts of the instant case, I conclude that the landlord's service was valid. The landlord, through the use of an agent, attempted personal service on four different occasions and, being unsuccessful, posted notice on each of those four different attempts. As the statute requires, the landlord mailed a copy of the notice to the tenant. This effort shows good faith on the part of the landlord to apprise the tenant of the pendency of the action. The landlord

**62**

violated neither any clear meaning, nor the spirit, of the requirement that a mailing occur within three days of posting, giving the tenant sufficient time to cure before the tenant was served a summons. The landlord, in fact, waited in excess of thirty days after the last posting to file his complaint for possession. The mailing of the copy of the notice seven days prior to the posting of the first notice did not harm the tenant in any way and, in fact, may have benefited the tenant by giving him additional time to cure.[8]

The trial court suggested a potential problem that could arise in a different set of circumstances if we read "within" in § 45–1406 to denote a point of finality. The court posed a scenario where, under this interpretation, a landlord could mail a notice on January first and then post in June, or worse yet, initiate a prophylactic mailing to all his tenants, and then post months later on any tenants that the landlord still wishes to evict. Setting aside the fact that in any case, a landlord needs a legally sufficient reason to evict a tenant, it is true that the statute alone would not render this process of notice insufficient. However, the constitutional requirements of *Greene* clearly would. A mailing that was prophylactic or that occurred months prior to posting would certainly not be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." *Greene, supra,* 456 U.S. at 449–50, 102 S.Ct. at 1878 (emphasis omitted). This is especially the case if the tenant can show that the landlord was simply trying to avoid the spirit of *Greene.* Therefore, I am not convinced that interpreting the service statute to permit the notice in this case could have the unintended consequence of allowing a landlord to comply with the language, but not the spirit, of the statute, under different circumstances. Guided

by due process requirements, courts will always be able to protect tenants in such cases.

In the instant case, the landlord was not attempting to avoid providing the tenant with notice. The landlord's service of notice not only conformed to the requirements of § 45–1406 and the spirit of *Greene,* but also, in fact, provided actual notice to the tenant. The landlord's suit should have been allowed. Accordingly, I respectfully dissent.

---

8. It is true that the landlord would have clarified his intentions had he provided a date on the notice indicating when the thirty day period began. Nevertheless, the landlord did not file his complaint until well after thirty days from the last posting, and there is no indication that the notice in this case confused the tenant in any way. Although clear dating of a notice would significantly assist some tenants in understanding their legal posture, I am not yet persuaded

that § 45–1406 either explicitly or implicitly creates such a requirement.