*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CV-0397

CHARLES E. WILSON, APPELLANT,

V.

MURIEL E. BOWSER, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2023-CAB-005414)

(Hon. Carl E. Ross, Trial Judge)

(Argued October 23, 2024                    Decided February 6, 2025)

*Johnny Barnes* for appellant.

*Sonya L. Lebsack*, Assistant Attorney General, with whom *Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Graham E. Phillips*, Deputy Solicitor General, were on the brief, for appellees Muriel E. Bowser and the District of Columbia.

*Christine Pembroke*, with whom *Terri D. Stroud* was on the brief, for appellee District of Columbia Board of Elections.

*Adav Noti*, *Kevin P. Hancock*, *Alexandra Copper*, *Benjamin Phillips*, and *Margaret Graham* filed a brief on behalf of *Make All Votes Count DC* as *amicus curiae*.

Before EASTERLY and HOWARD, *Associate Judges*, and THOMPSON, *Senior Judge*.

THOMPSON, *Senior Judge*: Appellant Charles E. Wilson sued the District of Columbia Board of Elections ("the Board"), Mayor Muriel E. Bowser in her official capacity, and the District of Columbia, objecting to then-proposed ballot Initiative 83 (sometimes referred to herein as "the Initiative"), also known as the "Make All Votes Count Act of 2024."[1]  Appellant objected, at least ostensibly, to the Initiative's summary statement, short title, and legislative form as adopted by the Board but, for the lion's share of his complaint (the "Complaint"), raised a number of challenges to the Board's determination that Initiative 83 was a "proper subject" for initiative.  The Superior Court (the Honorable Carl E. Ross) found the Complaint untimely because it was filed on the day before the start of the ten-day period described in D.C. Code § 1-1001.16(e)(1)(A) ("Subsection (e)(1)(A)"). Concluding that the court therefore lacked jurisdiction, Judge Ross dismissed the Complaint as against all the defendants.

In this appeal from the dismissal, appellant contends that the Superior Court erred in determining that it lacked jurisdiction to entertain his Complaint, reasoning that the "Complaint for declaratory and injunctive relief could have been

---

[1] Initiative 83 appeared on the ballot on November 5, 2024, and was approved by voters.

heard under the trial court's general equity jurisdiction, without regard to" the ten-day timeframe. In the alternative, appellant argues that his Complaint, which was filed after business hours on the day before the ten-day period described in the statute, should not have been adjudged untimely.

As discussed below, we conclude that (1) Subsection (e)(1)(A) is a claim-processing rule rather than a jurisdictional rule; (2) the ten-day period described in Subsection (e)(1)(A) is a deadline, rather than a time window during which any suit within its scope must be brought; (3) under its general equity jurisdiction, the Superior Court had the power to adjudicate appellant's challenges to the Board's "proper-subject" determination; and (4) the Mayor and the District are not proper defendants. For those reasons and others discussed below, we affirm the dismissal in favor of the District of Columbia and the Mayor on all claims, but otherwise vacate the order of the Superior Court and remand for further proceedings.

## I.    Background
### A.    The Initiative Process

District of Columbia law provides for an initiative process "by which the electors of the District of Columbia may propose laws . . . and present such proposed laws directly to the registered qualified electors of the District of

Columbia for their approval or disapproval." D.C. Code § 1-1001.02(10). The election process is overseen by the Board. *See generally id.* at § 1-1001.05.

If a qualified elector wishes to "submit a proposed initiative measure to the electors of the District of Columbia," they must first file with the Board "copies of the full text of the measure, a summary statement of not more than 100 words, and a short title of the measure to be proposed in an initiative," among other things. *Id.* at § 1-1001.16(a)(1). Once the Board receives the proposed initiative, it must review the initiative to determine whether it meets certain "proper subject" requirements, including that a ballot initiative may not (1) conflict with the District's Charter; (2) violate the U.S. Constitution; (3) interfere with the authority of the Council of the District of Columbia (the "Council") to appropriate funds; or (4) have the effect of authorizing discrimination prohibited under the D.C. Human Rights Act ("the DCHRA"). *Id.* at § 1-1001.16(b)(1); 3 D.C.M.R. § 1000.5. The Board must also request and receive advisory opinions from the Attorney General (the "OAG") and the Council's General Counsel ("the CGC") regarding whether a proposed initiative measure is a proper subject of initiative. *Id.* at § 1-1001.16(b)(1A)(A).

At this point in the process, if the Board rejects an initiative measure as being an improper subject, then the proposer may, within ten days of the Board's

decision, seek judicial review of the decision in the Superior Court. *Id.* at § 1-1001.16(b)(3). If, however, the Board accepts the measure as being a proper subject, then the Board assigns a serial number to the initiative and must prepare, and call a meeting to adopt, a "summary statement, short title, and legislative form" of the initiative measure. *Id.* at § 1-1001.16(b)(4)-(d)(1). Within twenty-four hours after adoption, the Board must publish those formulations on its website and submit them to the District of Columbia Register for publication. *Id.* at § 1-1001.16(d)(2).

Subsection (e)(1)(A) provides that if a qualified elector in the District objects to the formulations, then they may "seek review in the Superior Court of the District of Columbia within 10 calendar days from the date the Board publishes the [formulations] in the District of Columbia Register stating objections and requesting appropriate changes." *Id.* at § 1-1001.16(e)(1)(A).

### B. Initiative 83

Initiative 83, which a majority of District of Columbia voters approved on November 5, 2024, would, if implemented, institute ranked-choice voting for all elections in the District of Columbia involving three or more qualified candidates and establish a primary system in which "[a] duly registered voter who is not registered as affiliated with any political party shall be permitted to vote in a

primary election held by a single political party of that voter's choice" for all offices other than party offices.[2] However, the Initiative includes language specifying that it "shall apply upon the date of inclusion of its fiscal effect in an approved budget and financial plan." Thus, by its terms, Initiative 83 will not be implemented unless and until the Council appropriates funds for its implementation.

The Board accepted the proposer's submission and, as required by law, solicited advisory opinions from the OAG and the CGC as to whether the measure was a "proper subject" for an initiative and scheduled a public hearing to address that question. In her advisory opinion, the CGC opined that the measure would be "an impermissible 'law appropriating funds' because it would require the Board to allocate additional funds to implement ranked choice voting in the District." By contrast, in his opinion, the Attorney General concluded that the measure was a "proper subject" for an initiative, reasoning, inter alia, that it would not be a law appropriating funds because it would merely authorize (rather than compel) the Council to fund the changes it would require. At the public hearing, the Board

---

[2] Current law bars unaffiliated voters from changing their party affiliation after the twenty-first day prior to a primary election. *See* 3 D.C.M.R. § 504.3. If implemented, Initiative 83 would remove this restriction.

heard from the proposer and her attorney, as well as from individuals and organizations in favor of or opposed to the measure. The Board subsequently took the matter under advisement to meet in executive session.

Three days later, the Board reconvened and approved the measure as a "proper subject" for an initiative. In response to the principal objections that had been raised, the Board explained that (1) the Initiative would not conflict with the Charter's requirement that elections be conducted on a "partisan basis" because there would still be separate primaries for each major party, whose nominees would be identified by party on the general-election ballot; (2) the Initiative's specific terms would not violate the constitutional associational rights of voters, as determined by courts in other jurisdictions that have upheld the constitutionality of comparable primary systems; (3) the Initiative would not interfere with the Council's appropriations authority because it would not mandate funding, but instead would be subject to the ordinary budget process; and (4) the Initiative was not shown to have, by virtue of its ranked-choice voting feature, a discriminatory impact on one or more protected classes of voters who might be confused by that feature, and thus was not shown to authorize discrimination in violation of the DCHRA.

On Wednesday, August 23, 2023, the Board held a public hearing and adopted final formulations, including the Initiative's summary statement, short title, and legislative form. At the outset of the hearing, the Board's General Counsel announced that the adopted formulations would be published in the D.C. Register on September 1, 2023, "launch[ing] a 10 day period during which any registered voter who objects to the formulations may seek review in the Superior Court . . . including [of] the Board's determination that the proposed measure presents a proper subject for initiative." The formulations were posted on the Board's website on August 23, 2023. The formulations were published in the D.C. Register on September 1, 2023. *See* 70 D.C. Reg. 11907-12 (Sept. 1, 2023).[3]

### C.     The Complaint, the Motion to Dismiss, and the Dismissal Order

On August 31, 2023—one day prior to the publication of the formulations in the D.C. Register—appellant filed in the Superior Court his "Complaint for Declaratory Judgment, and Injunctive Relief, Objecting to the Summary Statement,

---

[3] The D.C. Register is published on Fridays. *See* 1 D.C.M.R. § 306.3. The D.C. Register website advises that the deadline for submitting notices for publication in the D.C. Register by District agencies and boards is "Thursday at noon of the previous week." *See* Publication and Regulatory Services, DC.gov: Office of the Secretary, https://os.dc.gov/service/publication-and-regulatory-services; https://perma.cc/P2YB-2MAU (last visited Dec. 5, 2024); *see also* 1 D.C.M.R. § 306.11 (table).

Short Title, and Legislative Form of Proposed Initiative No. 83" (which was stamped by the court as e-filed on "08/31/2023 5:29:46 PM"). The Complaint, which sought "expedited consideration" pursuant to Subsection (e)(1)(A), states in its title and in its "Introduction" that it is "an objection to the Summary Statement, Short Title, and Legislative Form" of the Initiative. The Complaint sets out separate counts alleging violations of the U.S. Constitution, the Home Rule Act, "the prohibition against appropriating," the DCHRA, and the District of Columbia Administrative Procedures Act (the "APA").

The defendants/appellees subsequently moved to dismiss the Complaint, arguing that, because it was filed the day before the formulations for Initiative 83 were published in the D.C Register (and thus, they asserted, outside the ten-day period described in Subsection (e)(1)(A)), the Superior Court lacked jurisdiction to entertain the case. The motion to dismiss asserted that "[a]lthough the Complaint contains six separately stated claims, the entire Complaint is properly read as a challenge to the Initiative Measure No. 83 under D.C. Code § 1-1001.16(e)(1)(A)." The motion also asserted that "the procedure set forth in [Subsection (e)(1)(A)] is the exclusive avenue for challenging initiative measures." In his opposition, appellant argued that the Complaint was timely because it was not "accepted" by the court until September 1. He further argued that even if his Complaint were

deemed filed on August 31, it should not be dismissed because a "one (1) day early" filing was not "untimely." In granting the motion to dismiss, the Superior Court ruled that "[r]eading § 1-1001.16(e)(1)(A) to permit [p]laintiff to raise a challenge to the Board's decision prior to its publication of the decision in the D.C. Register offends traditional notions of statutory interpretation and exceeds the bounds of this [c]ourt's jurisdiction." The court did not consider whether, as the Complaint asserts in its "Jurisdiction and Venue" section, it had jurisdiction under D.C. Code § 11-921(a).

On appeal, appellant renews his claim that the Complaint should not be considered untimely under Subsection (e)(1)(A). He further argues that the Superior Court erred by "applying the ten-day protest timeframe under D.C. Code § 1-1001.16(e)(1)(A) to all claims asserted in the Complaint," because the claims for "declaratory and injunctive relief could have been heard under the trial court's general equity jurisdiction, without regard to the [s]tatute."

## II.    Analysis

### A. Subsection (e)(1)(A) is Not a Jurisdictional Provision, but Instead is a Claim-Processing Rule.

As noted *supra*, the defendants' motion to dismiss argued that all of the claims encompassed in the Complaint "should be read as a challenge under [Subsection (e)(1)(A)]."[4]  The stated rationale for that argument was that the Complaint sought "to challenge the Board's acceptance of and formulations for [the Initiative] through arguments about the decision and rulemaking requirements under the APA."  Treating the Complaint as a challenge under Subsection (e)(1)(A), the Superior Court reasoned that it lacked jurisdiction to entertain the challenge because the Complaint was filed outside the ten-day period the Subsection describes.  Assuming that at least some of the claims set forth in the Complaint are properly read as brought under Subsection (e)(1)(A), we begin our analysis by considering whether the ten-day period in fact posed a jurisdictional bar.

---

[4] The Mayor and the District of Columbia now argue, in their brief in this appeal, that the gravamen of the Complaint was a claim that the Initiative was not a "proper subject," rather than a challenge to the wording of the summary statement, short title, or legislative form of the Initiative.  But this was not the position they took before the Superior Court.

In recent years, the Supreme Court has made clear the distinction between jurisdictional and claim-processing rules, emphasizing that "stringent requirements must be satisfied for a rule to have the effect of automatically stripping a court of 'jurisdiction'" in the sense of the court's "adjudicatory capacity." *Mathis v. D.C. Hous. Auth.*, 124 A.3d 1089, 1101 (D.C. 2015). Indeed, the Supreme Court has observed that "most time bars are nonjurisdictional." *Wilkins v. United States*, 598 U.S. 152, 158-59 (2023) (quoting *United States v. Wong*, 575 U.S. 402, 410 (2015)); *see also Mathis*, 124 A.3d at 1102 ("[T]he modern bright line default is that procedural rules, even those codified in statutes, are nonjurisdictional in character." (internal quotation marks and citation omitted)). Distinguishing between jurisdictional provisions (i.e., provisions governing "the classes of cases a court may entertain") and "nonjurisdictional claim-processing" provisions (i.e., provisions that "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times"), the Supreme Court has explained that it will "treat a procedural requirement as jurisdictional only if [the legislature] clearly states that it is." *Wilkins*, 598 U.S. at 157 (internal citations and quotation marks omitted). This court has said that "[i]t is not enough that the legislature articulated the deadline using 'mandatory' language." *Mathis*, 124 A.3d at 1102 (quoting *Wong*, 575 U.S. at 410). Rather, "[i]n order to 'imbue[]

a procedural bar with jurisdictional consequences,' the legislature 'must do something special.'" *Id.* (quoting *Wong*, 575 U.S. at 410).

We conclude that Subsection (e)(1)(A) does not satisfy that "something special" test. It "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the [Superior Court]." *Henderson v. Shinseki*, 562 U.S. 428, 438 (2011) (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)). Instead, it "reads like an ordinary, run-of-the-mill statute of limitations, spelling out a litigant's filing obligations without restricting [the] court's authority." *Wong*, 575 U.S. at 411 (internal quotation marks omitted) (quoting *Holland v. Florida*, 560 U.S. 631, 647 (2010)). In the absence of any indication of a clear legislative intent to make Subsection (e)(1)(A)'s ten-day timeframe jurisdictional, we now hold that it is a non-jurisdictional, claim-processing rule.[5]

---

[5] We acknowledge that some of our precedents have referred to similar judicial-review provisions of our election law as jurisdictional. *See, e.g.*, *Best v. D.C. Bd. of Elections & Ethics*, 852 A.2d 915, 918 (D.C. 2004) (referring to this court's "jurisdiction" under D.C. Code § 1-1001.11(b), which establishes a deadline for petitioning for this court's review of an election after the Board has certified the election results); *Jackson v. D.C. Bd. of Elections & Ethics*, 770 A.2d 79, 80 (D.C. 2001) (referring to this court's "statutory jurisdiction" under then-D.C. Code § 1-1315(b)) (currently codified at D.C. Code § 1-1001.11); *Scolaro v. D.C. Bd. of Elections & Ethics*, 717 A.2d 891, 893 (D.C. 1998) (referring to "the special jurisdictional grant of [then-]D.C. Code § 1-1315(b)"); *Scolaro v. D.C. Bd.*

To say that Subsection (e)(1)(A) is non-jurisdictional is not, however, to say that whatever time limitation it establishes is non-mandatory. As the Supreme Court has explained, "claim-processing rules . . . assure relief to a party properly raising them." *Eberhart v. United States*, 546 U.S. 12, 19 (2005) (per curiam). Here, defendants/appellees promptly asserted that appellant's challenge to Initiative 83 was untimely. Whether appellees are correct depends on whether Subsection (e)(1)(A) is most reasonably interpreted as imposing a mandatory time window for filing suit or, instead, a deadline by which any suit must be filed. We turn next to that issue.

---

*of Elections & Ethics*, 691 A.2d 77, 84 (D.C. 1997) (referring to this court's "jurisdiction" under then-D.C. Code § 1-1315(b) "to review an election"); *White v. D.C. Bd. of Elections & Ethics*, 537 A.2d 1133, 1134 (D.C. 1988) (referring to the deadline of then-D.C. Code § 1-1315(b) as "mandatory and jurisdictional").

However, "[t]he mere fact that this [c]ourt previously described something . . . as jurisdictional" is not dispositive. *Wilkins*, 598 U.S. at 159. We follow the Supreme Court's jurisprudence on this issue, *see Mathis*, 124 A.3d at 1102-03 (declining to follow *Capitol Hill Restoration Society v. District of Columbia Mayor's Agent for Historic Preservation*, 44 A.3d 271 (D.C. 2012) because it conflicted with the Supreme Court's decision in *Wong*), and "*M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971), does not oblige us to follow, inflexibly, a ruling whose jurisprudential basis has been substantially undermined by subsequent Supreme Court decisions." *Id.* at 1103 n.25 (internal quotation marks omitted) (quoting *Smith v. United States*, 984 A.2d 196, 200 (D.C. 2009)).

## B. Subsection (e)(1)(A) Establishes a Deadline, Which the Complaint Met, Rather Than a Time Window.

The Board urges us to adhere to case law that "ha[s] construed D.C. election law timeframes as mandatory . . . with respect to both early and late filings." Resolving that issue presents a task of statutory interpretation, which we begin, as always, "by looking first to the plain language of the statute to determine if it is clear and unambiguous." *Lopez-Ramirez v. United States*, 171 A.3d 169, 172 (D.C. 2017) (internal quotation marks omitted) (quoting *Peterson v. United States*, 997 A.2d 682, 683 (D.C. 2010)). "[T]he primary rule of statutory construction is to ascertain and give effect to legislative intent and to give legislative words their natural meaning . . . ." *Id.* (internal quotation marks omitted) (quoting *Grayson v. AT & T Corp.*, 15 A.3d 219, 237–38 (D.C. 2011) (en banc)). "Our review of questions of statutory interpretation is *de novo*." *Id.*

To focus our work, we repeat the language of Subsection (e)(1)(A) here:

> If any registered qualified elector of the District of Columbia objects to the summary statement, short title, or legislative form of the initiative measure formulated by the Board pursuant to subsections (c) and (d) of this section, that person may seek review in the Superior Court of the District of Columbia *within 10 calendar days from* the date the Board publishes the summary statement, short title, and legislative form in the District of Columbia Register stating objections and requesting appropriate changes.

D.C. Code § 1-1001.16(e)(1)(A) (emphasis added). The "within . . ." clause is critical; to determine what it means, we first look to see whether the term "within" "is 'plain and admits of no more than one meaning.'" *C.C. v. G.D.*, 320 A.3d 277, 290 (D.C. 2024) (quoting *Wong v. District of Columbia*, 314 A.3d 1236, 1241 (D.C. 2024)). The answer, as another court has pointed out, is that "the definition of the word 'within' has *not* been restricted to only one meaning." *Barco v. Sch. Bd.*, 975 So. 2d 1116, 1122-24 (Fla. 2008) (emphasis added). It therefore "is appropriate for us to look to dictionary definitions to determine [its] ordinary meaning." *Lucas v. United States*, 305 A.3d 774, 777 (D.C. 2023) (quoting *Tippett v. Daly*, 10 A.3d 1123, 1127 (D.C. 2010) (en banc)).

Subsection (e)(1) was originally enacted in 1979. *See* D.C. Law 3-1, § 2(c), 25 D.C. Reg. 9454 (June 7, 1979). The Black's Law Dictionary edition that was current "at the time of [original] enactment"[6] of the provision now codified as Subsection (e)(1)(A) instructed that "[w]hen used relative to time, the preposition 'within' has been defined as meaning 'any time before; at or before; at the end of;

---

[6] *United States v. Tate*, 999 F.3d 374, 378 (6th Cir. 2021); *777 Residential, LLC v. Metro. Dist. Comm'n*, 251 A.3d 56, 64 (Conn. 2020) ("[D]ictionaries in print at [the] time [of enactment] are especially instructive[.]" (quoting *State* v. *Menditto*, 110 A.3d 410, 414 (Conn. 2015))).

before the expiration of; not beyond; not exceeding; not later than.'"  *Within*,

Black's Law Dictionary 1437 (5th ed. 1979).  A recent edition of the Merriam-

Webster's Collegiate Dictionary similarly includes "before the end of" in the

definition of "within."  *Within*, Merriam-Webster's Collegiate Dictionary 1439

(11th ed. 2014).  In another example, the American Heritage Dictionary definition

includes both "[i]nside the fixed limits of" and "not beyond."  *Within*, American

Heritage Dictionary 2011 (3d ed. 1992).[7]

In *District of Columbia v. Gantt*, 558 A.2d 1120 (D.C. 1989), this court was

called to interpret a "within" clause similar to the one used in Subsection (e)(1)(A).

The provision in question was D.C. Code § 20-903(a) (1981), which then, as now,

provides in relevant part:

> [A]ll claims against a decedent's estate . . . shall be
> barred against the estate, the personal representative, and
> the heirs and legatees, unless presented within 6 months

---

[7] *See also, e.g.*, *In re Keller*, 120 F. Supp. 274, 275 (N.D. Cal. 1954) ("'Within' does not fix the first point of time, but the limit beyond which action may not be taken."); *Iowa State Dep't of Health v. Hertko*, 282 N.W.2d 744, 751 (Iowa 1979) ("'[W]ithin' frequently means 'not beyond, not later than, any time before, before the expiration of.'  In this sense 'within' fixes the end but not the beginning of the period of time." (quoting *Jensen v. Nelson*, 19 N.W.2d 596, 598 (Iowa 1945) (observing that "[t]his meaning is neither unusual nor strained and is well recognized in law"))).

> after the date of the first publication of notice of the appointment of a personal representative . . . .

We noted that the statutory language did "not clearly state whether a claim may only be filed within the specified six-month period or may be filed earlier but no later than the end of that period" and explained that we therefore "must look at the legislative history of the statute." *Id.* at 1122. We observed that the statute had been enacted as part of probate-reform legislation that was intended to address the problems that "under then-existing law, the final date for filing claims against the estate was unpredictable and amorphous." *Id.* at 1122-23 (internal quotation marks omitted). Citing the Committee Report on the legislation, we explained that in adopting § 20-903(a), the Council "focused only on a termination date for the filing of claims, not on a beginning date as well." *Id.* at 1123. We recognized that "[a]rguably, [the] language also could be read to intimate a starting point for the presentation of claims ('after notice of the appointment of the personal representative')." *Id.* However, we determined that the main purpose of the legislation—"to establish finality in the assertion of claims so that a personal representative can decide claims and distribute the estate with reasonable dispatch" —"would not be enhanced by establishing a date before which claims could not be filed." *Id.* We concluded and held that "more reasonably interpreted, . . . the

statute creates only a cutoff point measured by reference to the date of notice of appointment of the personal representative." *Id.*[8]

---

[8] Other courts have similarly interpreted statutory provisions that require complaints or claims to be filed "within" a specified number of days after or from a specified event. *See, e.g.*, *Davies v. Miller*, 130 U.S. 284, 288-89 (1889) (holding that the phrase "'within ten days after the ascertainment and liquidation of the duties' must . . . , according to the fair and reasonable interpretation of the words as applied to the subject-matter, be held to fix only the . . . limit beyond which the notice [of dissatisfaction] shall not be given, and not to fix . . . the first point of time at which the notice may be given"); *Barco*, 975 So. 2d at 1119, 1122-24 (interpreting a statute that provided that "[a]ny party seeking a judgment taxing costs [or] attorneys' fees . . . shall serve a motion within 30 days after filing of the judgment"; finding "no indication that the purpose behind the rule was to create a narrow window to begin only after the filing of the judgment"; observing that "the potential that one may be required to pay an opposing party's attorney's fees may often be determinative in a decision on whether to pursue a claim, dismiss it, or settle"; and reasoning that therefore the language in issue "should be construed in a manner that does not prevent the service of an early motion for such fees or costs"); *Glaze v. Grooms*, 478 S.E.2d 841, 844 (S.C. 1996) ("If an action is required by statute within a certain time 'after' an event, the general rule is that the action may be taken before the event, since the statute will be considered as fixing the latest, but not the earliest, time for taking the action.") (quoting 86 C.J.S. *Time* § 8); *In re Estate of Kruse*, 226 P.2d 835, 838-39 (Kan. 1951) (construing a statute providing that "[a]ll demands, . . . against a decedent's estate . . . not exhibited . . . within nine months after the date of the first published notice to creditors . . . shall be forever barred from payment"; reasoning that "the only reasonable and logical interpretation of the word as used in the statute is that it is a word of 'limitation' and means a creditor must file his claim *not later* than nine months after the date of the first published notice to creditors"); *Tanzilli v. Casassa*, 85 N.E.2d 220, 221 (Mass. 1949) (construing statute that required that an appeal be "filed in . . . court within fifteen days after such decision [of the board of appeals] is recorded"; holding that an appeal was lawfully filed because "[i]t is well settled . . . , where a statute required action within a certain time 'after' an

We reach a similar conclusion here, as it is difficult to square the implications of a "window" with what the statute tries to accomplish—timely and accurate challenges to fast-moving election-related matters—and also difficult to think that the Council would have sought to create a procedural trap for objectors who act diligently.

Of course, in determining whether to follow *Gantt*[9] in interpreting Subsection (e)(1)(A), "[w]e may also [and should] look to the legislative history to

___

event, that the action may be taken before that event. Such statutes have been construed as fixing the latest, but not the earliest, time for the taking of the action").

[9] We distinguished *Gantt* in *Ayers v. Landow*, 666 A.2d 51 (D.C. 1995). In *Ayers*, we were concerned with D.C. Code § 45-1406 (1990), which provided in pertinent part that if a notice to quit was posted on a premises, "a copy of the notice shall be mailed . . . to the premises . . . *within 3 calendar days of the date of posting*." *Id.* at 53. We agreed with the trial court that mailing of the notice a substantial period *before* the posting was not in conformity with the language of the statute. *Id.* at 53-55. We reasoned that in the notice-to-quit context, "to read the phrase 'within three days[]' . . . as countenancing mailings effected weeks or even months before the posting . . . would create . . . a host of practical problems which the legislature could not have intended." *Id.* at 54. We asked, "[w]hen, for example, would the tenant be required to 'cure or quit' if a letter were mailed to him on January 1, and if a notice were tacked to his door half a year later . . . ?" *Id.* We also noted that the statute "requires the mailing of the letter . . . only *if* the notice [has been] posted on the premises." *Id.* at 55. We further noted that "mailing of the notice *to supplement* posting is required by § 45-1406 for constitutional reasons." *Id.* (emphasis added). We do not perceive that any similar considerations are relevant in the context with which we are concerned here.

ensure that our interpretation is consistent with legislative intent." *Facebook, Inc. v. Wint*, 199 A.3d 625, 628 (D.C. 2019) (quoting *Thomas v. Buckley*, 176 A.3d 1277, 1281 (D.C. 2017)). As first adopted in 1979, Subsection (e)(1) provided that the proposer of an initiative or referendum could file suit in Superior Court objecting to the summary statement, short title, and legislative form adopted by the Board. *See* D.C. Law 3-1, § 2(c), 25 D.C. Reg. 9454 (1979). It was later amended to permit "any registered qualified elector" to bring such a suit. *See* D.C. Law 4-88, § 2(k)(5)(A), 29 D.C. Reg. 458 (1982). Thus, Subsection (e)(1) provided in pertinent part:

> If any registered qualified elector of the District of Columbia objects to the summary statement, short title or legislative form of the initiative or referendum measure formulated by the Board pursuant to subsection (c) of this section, that person may seek review in the Superior Court of the District of Columbia within ten calendar days from the date such person receives such summary statement, short title and legislative form stating his or her objections and requesting appropriate changes.

D.C. Code § 1-1320(e)(1) (1987) (quoted in *Johnson v. Danneman*, 547 A.2d 981, 982 n.2 (D.C. 1988)). Section 1-1320(e)(1) was further amended in 1988 so that the ten-day period was tied to when the formulations were published, in both the D.C. Register and a newspaper of general circulation, rather than when they were received. *See* D.C. Law 7-92, § 3(n), 35 D.C. Reg. 719 (1988). Section

1-1320(e)(1) was additionally amended in 1992 to remove the reference to referendum measures, so that it applies only to initiative measures. *See* D.C. Law 9-75, § 2(e), 39 D.C. Reg. 310 (1992) (setting out the full language of Subsection 1-1320(e)(1)(A) as revised and re-enacted). With the 1988 and 1992 amendments, it reads as follows:

> If any registered qualified elector of the District of Columbia objects to the summary statement, short title, or legislative form of the initiative measure formulated by the Board pursuant to subsection (c) of this section, that person may seek review in the Superior Court of the District of Columbia within 10 calendar days from the date the Board publishes the summary statement, short title, and legislative form in the District of Columbia Register and in a newspaper of general circulation . . . .

D.C. Code § 1-1320(e)(1)(A) (1992). *See* D.C. Law 9-75, effective March 11, 1992.

The Committee Report to the 1992 amendments focused on the rationale for removing the requirement that the formulations for a referendum be published in the D.C. Register "before the measure may be challenged," while retaining that requirement for initiatives. Report on Bill No. 9-242, the "Voter Roll Maintenance Act of 1991," before the Committee on Government Operations, Council of the District of Columbia at 4 (Sept. 26, 1991) [hereinafter "Report on Bill 9-242"]. The Committee observed that, unlike an initiative, a referendum "must go through

its challenge period within the 30-day Congressional review period." *Id.* It explained that "[t]o publish in the D.C. Register adds at least one week" before a challenge could be filed, which "cuts into the time available for petition circulation—the effect of which can be to nullify the referendum right granted by the Home Rule Charter." *Id.* Thus, to paraphrase *Gantt*, the legislative history of the 1992 amendments shows that the Council "focused [not] only on a termination date for the filing of claims, [but] on a beginning date" as well. 558 A.2d at 1123.[10] For that reason, considered alone, the 1992 legislative history could support interpreting Subsection (e)(1)(A) as designating a date—the D.C. Register publication date—before which a lawsuit challenging the Board's initiative

---

[10] The 1992 legislative history also includes a "D.C. Board of Elections Legislative Request Section Analysis of Bill 9-242." The Board's analysis referred to the possibility that publication in the D.C. Register, "at which time the 10 day challenge period begins," can be delayed "for as many as 24 days" because of the deadline for submission of items for publication, and states that "while this is not a problem for initiatives, it has a major impact on referendum measures." D.C. Board of Elections Legislative Request Section Analysis of Bill 9-242, at 12. Thus, the analysis contains an interpretation by the Board, contemporaneous with enactment of the 1992 amendments to Section 1-1320(e)(1)(A), that the start of the challenge period for initiatives is linked to the date of publication in the D.C. Register.

formulations could not be filed, and not as merely setting a cutoff point or deadline for filing suit.

However, the landscape changed further with a 2021 amendment to D.C. Code § 1-1001.16(d). Effective March 16, 2021, the Council added a requirement that the Board publish the summary statement, short title, and legislative form of an initiative measure "on the Board's website" within twenty-four hours of its adoption of formulations (in addition to submitting them to the D.C. Register for publication). D.C. Code § 1-1001.16(d)(2)(C); D.C Law 23-192, 68 D.C. Reg. 1073, 1082 (2021); see also 3 D.C.M.R § 1001.3(c). The Council noted testimony that "[t]he public should not be expected to continually visit the Board of Elections website to determine Board of Elections action, but instead should be able to rely on the DC Register as the repository for all official District of Columbia notices." Report on Bill No. 23-0165, the "Initiative and Referendum Process Improvement Amendment Act of 2020," before the Committee on the Judiciary and Public Safety, Council of the District of Columbia [hereinafter "Report on Bill 23-0165"], Statement of Andrew J. Kline, General Counsel, Restaurant Association of Metropolitan Washington, Attachment D at 2 (Nov. 23, 2020); see also Report on Bill 23-0165 at 13. Presumably for that reason, the Council did not disturb the Subsection (e)(1)(A) link between publication in the D.C. Register and the ten-day

challenge period. But its addition of a requirement to publish initiative formulations on the Board's website evinces, we think, an intent to take advantage of (post-1992) technological advances to provide information to potential objectors sooner rather than later, an intent that superseded or displaced any prior, necessity-based presumption about a start-date for challenges. As in *Gantt*, "th[e] purpose [of the 2001 amendment and of the statute more generally] would not be enhanced" by reading [the statute] to establish a date before which claims could not be filed. 558 A.2d at 1123.

For the foregoing reasons, we conclude the Complaint, to the extent it brought a challenge under Subsection (e)(1)(A), was not untimely for being filed outside of a ten-day window. Rather, it was timely because it was filed before the end of the ten-day period.

### C. The Superior Court was Authorized to Hear Appellant's "Proper-subject" Challenge Pursuant to its General Equity Jurisdiction.

Even on our assumption that some allegations of the Complaint were properly read as brought under Subsection (e)(1)(A), we read the lion's share of the Complaint as raising a substantive challenge, premised on several grounds, that the Initiative was not a "proper subject" of the initiative process. We hold that the

Superior Court separately had jurisdiction to entertain that challenge under D.C. Code § 11-921(a).

This court stated in *Hessey v. Burden*, 615 A.2d 562 (D.C. 1992), that D.C. Code § 1-1320(e)—as recodified, Section 1-1001.16(e)—"does not permit substantive challenges to [a] proposed initiative; it merely authorizes judicial scrutiny of the Board's summary statement, short title, and legislative form." *Id.* at 581. However, with minor exceptions not pertinent here, "the Superior Court has jurisdiction of any civil action or other matter (at law or in equity) brought in the District of Columbia." D.C. Code § 11-921(a). We have construed this grant of jurisdiction broadly; we held in *Andrade v. Jackson*, 401 A.2d 990 (D.C. 1979), that the Superior Court is "a court of general jurisdiction with the power to adjudicate any civil action at law or in equity involving local law." *Id.* at 992.

Especially pertinent here, in *Hessey*, we rejected as "flawed" an argument that D.C. Code § 1-1320 (as noted, recodified as Section 1-1001.16) is "the exclusive source of standing to challenge proposed initiatives in the Superior Court." 615 A.2d at 570. We explained that this argument "ignores the Superior Court's statutory grant of general equity jurisdiction." *Id.* at 571; *see also id.* at 566, 570 (noting that opponents of the initiative involved in that case "file[d] a second action [in accordance with D.C. Code § 1-1320(e)] . . . contesting the

summary statement, short title, and legislative form[,] while simultaneously [in the first action] challenging the substance of the proposed initiative"). We note that the Board's brief acknowledges that *Hessey* concluded that there is a "basis in equity law to consider the [proper subject] claims of" opponents of an initiative.

Under the Superior Court's exercise of its general equity jurisdiction, there is no particular window or deadline for filing a complaint raising a "proper subject" challenge.[11] However, in that such a complaint asks the court to exercise its equitable powers, the principle that "equity aids the vigilant" is certainly applicable. *Mathis*, 124 A.3d at 1104 (quoting *Simpson v. District of Columbia Off. of Hum. Rts.*, 597 A.2d 392, 403-04 (D.C.1991)). In determining whether such a challenge is timely, the Superior Court could reasonably consider "whether there [has been] unexplained or undue delay" and whether allowing the action to proceed "would work an injustice to the other party." *Id.* This court has acknowledged that "proper subject" issues should be resolved early on rather than

---

[11] We note that the Board's D.C. Register notice advised that during the ten-day period referenced in Subsection (e)(1)(A), "[r]egistered qualified electors may . . . file objections regarding the initiative with the court on other grounds . . . including the Board's determination that the proposed measure presents a proper subject for initiative." 70 D.C. Reg. 11907 (Sept. 1, 2023). However, no statutory provision, regulation, or court rule provides that such a substantive challenge may be brought *only* during that ten-day period.

late in the process, *see Hessey*, 615 A.2d at 570 ("[W]hether a measure is a 'proper subject of initiative' should be answered in its entirety before the summary statement, short title, and legislative form are even prepared."), and we have no doubt that the Board would vigorously resist "proper subject" complaints filed on a timetable that would unduly disrupt ballot access or otherwise seriously interfere with the sound administration of elections. Similarly, a "proper subject" challenge brought prior to the Board's resolution of "proper subject" issues, or before the Board had deliberated and decided that a proposed initiative could go forward and caused it to be published, would undoubtedly be unripe, but that is not an issue in this case because there is no dispute that the Board had completed all the foregoing well prior to the filing of the Complaint.[12]

---

[12] The fact that the formulations published on the Board's website were the same finalized formulations published several days later in the D.C. Register makes this case quite unlike *Lawrence v. D.C. Bd. of Elections & Ethics*, 611 A.2d 529 (D.C. 1992), a case on which the Board relies. There, the petitioner sought review by this court of a Board order denying the petitioner's challenge on residency grounds to former Mayor Barry's qualification to run again for Mayor. *Id.* at 530. We observed that at the time the Board acted, "nominating petitions for Mr. Barry were still in circulation" and "[n]one had yet been filed." *Id.* at 531. We explained that the "statutory and regulatory scheme sensibly precludes judicial review of challenges brought at a point at which it may still be uncertain whether the prospective candidate successfully will complete the formal steps toward becoming a candidate or what the full range of current challenges may be." *Id.* We observed that "[a] grant of a direct appeal to this court at the preliminary point

In sum, we hold that the Superior Court had general equity jurisdiction to hear appellant's substantive challenges to the Board's "proper subject" determination.[13]  The court therefore erred by dismissing the Complaint.

---

when the first petition was filed here would distort the statutory and regulatory process, as well as encourage piece-meal and possibly moot appeals." *Id.*

[13] Our conclusion is not contrary to our recognition that if a statute sets out a process by which agency action may be challenged, "it is the only permitted means of doing so." *Davies v. D.C. Bd. of Elections & Ethics*, 596 A.2d 992, 994 (D.C. 1991).  Nor is it in tension with the axiom that "equity has no jurisdiction over a controversy for which there is a complete and adequate remedy at law." *Square 345 Ltd. P'ship v. District of Columbia*, 927 A.2d 1020, 1026 (D.C. 2007); *see also Richardson v. D.C. Redevelopment Land Agency*, 453 A.2d 118, 121 (D.C. 1982) (Nebeker, J., concurring) (noting that the Superior Court may not exercise its equity jurisdiction to intervene in an agency proceeding without a showing by the complainant of "the absence of any other judicial or administrative remedy"). Subsection (e)(1)(A) lays out a precise statutory challenge process by which opponents can challenge the "summary statement, short title, or legislative form of the initiative measure formulated by the Board."  D.C. Code § 1-1001.16(e)(1)(A). Thus, if an opponent wishes to challenge these formulations by the Board, Subsection (e)(1)(A) "is the only permitted means of doing so." *Davies*, 596 A.2d at 994.  But because we have said that Subsection (e)(1)(A) "does not permit substantive challenges to [a] proposed initiative" and "merely authorizes judicial scrutiny of the Board's summary statement, short title, and legislative form," *Hessey*, 615 A.2d at 581, it was not an available "judicial . . . remedy" for appellant's "proper subject" claims or the "only permitted means" to bring those claims. *Davies*, 596 A.2d at 994.

## D. The Claims against the Mayor and the District of Columbia Must Stand Dismissed.

Finally, we agree with the Mayor and the District that "[e]ven assuming that [appellant] was sufficiently injured by the Board's proper-subject determination, no allegations support that this injury is traceable to, or redressable by relief running against, the Mayor or the District." The Board is "the gatekeeper for the initiative process." *Marijuana Pol'y Project v. United States*, 304 F.3d 82, 84 (D.C. Cir. 2002). It is an independent agency that is "not . . . subject to the direction of any nonjudicial officer of the District." D.C. Code § 1-1001.06(a). Thus, the Mayor and the District "neither direct the Board's actions nor enforce or administer the D.C. Election Code." We therefore affirm dismissal of appellant's Complaint as to these appellees for lack of standing. *See Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 900 (4th Cir. 2022) (stating that standing "requires a showing that each defendant caused the plaintiff's injury" (internal brackets omitted) (quoting *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017))); *Riverside Hosp. v. D.C. Dep't of Health*, 944 A.2d 1098, 1104 (D.C. 2008) (stating that to meet the requirements of standing, a party must demonstrate that it is likely that a decision against the defendant will redress the claimed injury).

### III. Conclusion

For the foregoing reasons, we affirm the dismissal in favor of the District of Columbia and the Mayor on all claims; otherwise vacate the order of the Superior Court; and remand the case to the Superior Court for further proceedings to address appellant's claims. It is

*So ordered.*